UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD WITCHKO, Individually and on Behalf of All Others Similarly Situated, | ) ) | Civil Action No. 2:25-781 |
| | ) | |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| | ) | |
| vs. | ) ) | CLASS ACTION COMPLAINT |
| | ) | |
| EDGECO HOLDINGS, L.P., NEWEDGE CAPITAL GROUP, LLC, NEWEDGE SECURITIES INC., NEWEDGE SECURITIES, LLC, and NATIONAL FINANCIAL SERVICES LLC, | ) ) ) ) ) | |
| | ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

By and through his undersigned counsel, Richard Witchko ("Plaintiff") brings this class action against defendants EdgeCo Holdings, L.P. ("EHL"), NewEdge Capital Group, LLC ("NCG"), NewEdge Securities Inc., formerly known as Mid Atlantic Capital Corporation ("NESI"), NewEdge Securities, LLC ("NESL" and, together with NESI, "NES," and, together with EHL, NCG, and NESI, "NewEdge"), and National Financial Services LLC ("NFS") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Defendants with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to NewEdge's cash sweep programs ("Sweep Programs").  Under the Sweep Programs, Defendants automatically invested customer cash into interest-bearing deposit accounts at program banks selected by Defendants.

2.      The Sweep Programs were highly lucrative for Defendants but paid unreasonable, below-market yields to NewEdge customers.  Defendants determined the yields paid to customers by retaining, as "fees," large portions of the interest paid by the program banks.  In other words, Defendants profited off of the difference between the amounts paid by the program banks on the deposit accounts and the yields passed along by Defendants to NewEdge's customers.

3.      Defendants' exploitation of NewEdge customers and failure to pay them a reasonable rate of interest under the Sweep Programs breached their fiduciary and contractual

duties, including the implied covenant of good faith and fair dealing, and otherwise violated several state laws.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

5.      This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of Pennsylvania through the promotion, sale, marketing, distribution, and operation of their products and services.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants transacted business in this District, NewEdge was headquartered in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

**Plaintiff**

7.      Plaintiff Richard Witchko is a citizen of Pennsylvania.  During the relevant time period, Plaintiff held a standard brokerage account with NewEdge.  Cash balances held in Plaintiff's account were swept into the banks that Defendants selected in their discretion and earned unreasonably low yields, as alleged herein.

**Defendants**

8.      Defendant EdgeCo Holdings, L.P. is a Delaware limited partnership headquartered at 1251 Waterfront Place, Suite 510, Pittsburgh, PA 15222.  ECH is a financial services company that conducts business throughout the United States, services more than $600 billion in assets, and has over 900 employees.  ECH is the parent company and control person of NCG and NES.

9.      Defendant NewEdge Capital Group, LLC is a Delaware corporation headquartered at 1251 Waterfront Place, Suite 510, Pittsburgh, PA 15222.  NCG is a financial services company that conducts business throughout the United States, with approximately $65 billion in assets under management.  NCG provides investment advisory, wealth management, and brokerage services through wholly-owned subsidiaries including NES.  NCG was launched by ECG on November 1, 2021 as the "official brand of the firm's wealth management division" to bring together several wealth management operations EdgeCo had launched or acquired since 2018.

10.     Defendant NewEdge Securities, Inc., formerly known as Mid Atlantic Capital Corporation, is a Pennsylvania corporation headquartered at 1251 Waterfront Place, Suite 510, Pittsburgh, PA 15222.  NESI is a broker-dealer that offers brokerage services to a nationwide client base.  NESI maintained and operated the Sweep Programs in conjunction with NFS.  NESI is a wholly-owned subsidiary of ECH and NCG.

11.     Defendant NewEdge Securities, LLC is a Pennsylvania limited liability company headquartered at 1251 Waterfront Place, Suite 510, Pittsburgh, PA 15222.  NESL is a broker-dealer that offers brokerage services to a nationwide client base.  From 2024 through present, NESL maintains and operates the Sweep Programs in conjunction with NFS.  NESL is a wholly-owned subsidiary of ECH and NCG.

12.     National Financial Services LLC is a Delaware limited liability company headquartered at 245 Summer Street, Boston, MA, 02210.  NFS is a broker-dealer that offers

brokerage services to its nationwide client base.  During the relevant time period, NFS was engaged by NewEdge to provide custody and clearing services in connection with the Sweep Programs.  NFS is a wholly-owned subsidiary of Fidelity Investments ("Fidelity").

## SUBSTANTIVE ALLEGATIONS

### Background on the Sweep Programs

13.    NewEdge offers brokerage services to customers nationwide, including the Sweep Programs.  Until in or around October 2024, NewEdge offered the Sweep Programs to customers through NESI.  Since then, NewEdge has offered the Sweep Programs through NESL.  Throughout the relevant period, NewEdge offered the Sweep Programs in conjunction with NFS, a subsidiary of Fidelity that provided custody and clearing services for customers in the Sweep Programs.

14.    The Sweep Programs consist of two separate programs, the Bank Deposit Sweep Program ("BDSP") and the Retirement Sweep Program ("RSP").  The BDSP is the "sole core account investment sweep vehicle" for NewEdge brokerage accounts (with the exception of Keogh plan accounts, 403(b) plan accounts, and accounts with non-U.S. mailing addresses) and NewEdge non-retirement advisory accounts.  The RSP, on the other hand, serves as the sole investment sweep vehicle for NewEdge retirement advisory accounts.

15.    The terms and conditions of the Sweep Programs are set forth in a Brokerage Account Customer Agreement[1] ("Customer Agreement") and Bank Deposit Sweep Program (BDSP) Disclosure Document[2] ("Disclosure Document") (collectively, "Program Documents").

---

[1]    National Financial Services LLC, *Brokerage Account Customer Agreement*, https://www.newedgecapitalgroup.com/wp-content/uploads/Brokerage_Account_Customer-Agreement.pdf (last visited June 5, 2025).

[2]    NewEdge Securities, LLC, *Bank Deposit Sweep Program (BDSP) Disclosure Document* (Dec. 3, 2024), https://www.newedgecapitalgroup.com/wp-content/uploads/BDSP-Disclosure-Document-12.3.2024.pdf.

The Disclosure Document governs both the BDSP and the RSP.  The Customer Agreement is governed by the laws of the Commonwealth of Massachusetts and incorporates the terms of the Disclosure Document.

16.    Under the Sweep Programs, NewEdge automatically invests eligible clients' cash balances into interest bearing deposit accounts ("Deposit Accounts") with program banks selected by Defendants ("Program Banks").[3]  Funds held by the Program Banks are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000 per depositor.

17.    As provided in the Disclosure Document, the interest rates paid to customers in the BDSP "will be based on [each customer's] assigned tier, as determined by [NewEdge], based upon the value of the Program Deposit in each individual Deposit Account" and "will vary based upon prevailing economic and business conditions."[4]  Currently, customer cash invested under the BDSP accrues interest according to the following tier schedule (effective June 2, 2025):

---

[3]    The Program Banks currently consist of the following: Citibank, National Association; Wells Fargo Bank, National Association; Bank of Baroda; State Street Bank and Trust Company; Dollar Bank, Federal Savings Bank; Tristate Capital Bank; The Huntington National Bank; Deutsche Bank Trust Company Americas; Manufacturers and Traders Trust Company; JPMorgan Chase Bank, National Association; Capital One, National Association; Barclays Bank Delaware; East West Bank; BMO Bank National Association; First Horizon Bank; U.S. Bank National Association; and PNC Bank, National Association. *See* NewEdge Capital Group, *Multiple List Program* (Dec. 3, 2024), https://www.newedgecapitalgroup.com/multiplelistprogram/.

[4]    New Edge, *Disclosure Document*, *supra* note 2 at 2, 10.

| Balance greater than: | But less than: | Rate | APY[3] |
|---|---|---|---|
| $0.00 | $5,000 | 0.43% | 0.43% |
| $4,999 | $100,000 | 0.43% | 0.43% |
| $99,999 | $500,000 | 0.43% | 0.43% |
| $499,999 | $1,000,000 | 0.64% | 0.64% |
| $999,999 | $5,000,000 | 1.06% | 1.07% |
| $4,999,999 | $10,000,000 | 1.70% | 1.71% |
| $10,000,000 | | 2.34% | 2.37% |

18.    Under the RSP, on the other hand, "interest earned is not based on the Tiered Structure" but rather is "calculated and paid based on a level fee structure."[5]

19.    NewEdge and NFS act as the agents and custodians on behalf of customers in the Sweep Programs and effectively manage and control customers' cash in the Sweep Programs, including by unilaterally selecting the Program Banks, establishing Deposit Accounts at the Program Banks, moving customer cash to and from the Deposit Accounts, setting and adjusting interest rates and interest rate tiers, coordinating with the Program Banks to establish the interest rates paid on customer deposits in the Sweep Programs, and retaining a fee from the interest accrued on the Deposit Accounts.   Indeed, the Disclosure Document expressly provides that NewEdge and NFS act as agents on behalf of customers in the Sweep Programs:

- "The establishment of a Deposit Account will not create a direct account relationship between you and the Program Banks.  NFS, as your agent and custodian, will establish the Deposit Accounts for you at each Bank and make deposits to and withdrawals from the Deposit Accounts."[6]

---

[5]    *Id.*

[6]    *Id*. at 2.

- "NewEdge and NFS reserve the right to make changes to the Program Bank List at any time. This may include the addition or removal of Program Banks."[7]

- "NFS, as your agent, will place, regardless of the maximum potential applicable FDIC insurance coverage available, in any one Program Bank up to $246,500 of your cash balances for each individual account[.]"[8]

- "As your agent, NFS is establishing Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from Deposit Accounts and transferring funds between Deposit Accounts. Deposit Account ownership will be evidenced by a book entry on the account records of each Bank showing the Deposit Account as an agency account held by NFS for the benefit of you and other customers and by records maintained by NFS as your agent and custodian."[9]

- "NFS will automatically withdraw funds from your Deposit Accounts (up to the amount of your Program Deposit) and move such funds back to your Investment Account in order to satisfy any obligation you have to [NewEdge] or NFS or to settle a securities transaction or other debit transaction (including, but not limited to, checks, wires, debit card purchases or margin balances) in any account you have with [NewEdge] or NFS. Your Program Deposits are also subject to legal process such as a levy or a garnishment delivered to [NewEdge] or NFS to the same extent as if those funds were in your Investment Account."[10]

20.     NewEdge and NFS also reserve the right to modify the BDSP itself, "which may result in changing the core account investment vehicle for your Investment Account" and may result in the "transfer [of] the balances from your prior core account investment vehicle into a new core account investment vehicle."[11]

---

[7]   *Id.* at 11.

[8]   *Id.* at 4.

[9]   *Id.* at 13.

[10]   *Id.* at 9.

[11]   *Id.* at 12. NewEdge and NFS also reserve the right to sweep customers' cash balances into an "overflow" money market mutual fund ("MMKT Overflow") under certain circumstances, such as "[i]f the [BDSP] does not have sufficient deposit capacity to accept new or maintain existing deposits." *Id.* at 5. The money market mutual fund used as the MMKT Overflow is currently the Fidelity Government Money Market Fund S Class. *Id.* After sweeping cash into the MMKT Overflow, NES and NFS may move funds back to the Program Banks at their discretion: "From time to time, and as part of the management of the [BDSP], if additional deposit capacity becomes

**Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

21.     The Sweep Programs provide highly lucrative financial benefits to Defendants and the Program Banks.  Both NewEdge and NFS extract fees from the interest paid by the Program Banks on the Deposit Accounts under the BDSP, which substantially reduce the interest customers receive on their cash.[12]  For example, NewEdge retains a whopping **90%** of the "average all-in interest paid by the Program Banks" to customers with cash balances of less than $500,000.[13]  Customers with greater cash balances fare only marginally better:  NewEdge retains 85% of the interest paid by Program Banks to customers with cash balances between $500,000 and $1,000,000; 75% for customers with balances between $1,000,000 and $5,000,000; 60% for customers with balances between $5,000,000 and $10,000,000; and 45% for customers with balances of $10,000,000 and above.[14]

22.     Under the RSP, NewEdge and NFS similarly extract fees from the interest paid by Program Banks, which reduce the interest rate paid to customers on cash deposits.  The fees retained by NewEdge under the RSP, however, are calculated according to a fee schedule, which

---

available, NFS, in collaboration with NewEdge may periodically sweep funds out of the MMKT Overflow and back to Banks on your Program Bank List to be held as a Program Deposit (a 'Rebalance Event')."  *Id.* at 6.

[12]  *Id.* at 1; *see also id.* at 15 (stating that the fees extracted by NewEdge are "equal to the average all-in interest paid by the Program Banks, *less the interest payable to you*, and less the fee payable to NFS" and that the fees paid to NFS are "equal to 0.25% of assets in each Eligible Account on an annual basis").

[13]  *See id.* at 15.

[14]  *Id.*

"is indexed to the current Federal Funds Target Rate ("FFT Rate") published by the Federal Reserve System."[15]  NewEdge also collects an advisory fee on cash balances in the RSP:

> If you are participating in the Sweep Program through an Advisory Retirement Account, the fees that [NewEdge] receive[s] from the Program Banks are in addition to the advisory fee that you pay your Financial Advisor.  This means that we earn two layers of fees on the same cash balances in your Advisory Retirement Account.  Therefore, [NewEdge] ha[s] an incentive to encourage you to participate in RSP.[16]

23.     The Program Banks also benefit from the Sweep Programs, using customer cash deposits "to fund current and new lending and for investment activities."[17]  In particular, "[t]he Program Banks earn net income from the difference between the interest they pay on Program Deposits and the fees paid to [NewEdge] and the income they earn on loans, investments and other assets."[18]  Therefore, "[l]ower rates may be more financially beneficial to a Program Bank."[19]

24.     Due to these adverse financial incentives, Defendants extracted unreasonable, unjustified, and arbitrary fees and otherwise failed to negotiate, secure, and pass along reasonable sweep interest rates for customers in the Sweep Programs.

25.     A reasonable rate of interest is the rate that would result in a competitive market under fair market valuation conditions, *i.e.*, a rate parties would agree to in an arm's-length transaction where neither party was able to exert market power over the other.

---

[15]  *Id.* at 14.

[16]  *Id.* at 14-15.

[17]  *Id.* at 16.

[18]  *Id.*

[19]  *Id.*

26.    As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."  In the rate context, "reasonable" is synonymous with "fair market value" and can be determined using a market approach of comparable instruments.

27.    "Fair market value" ordinarily represents "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction . . . ."[20] Similarly, "fair market value" is defined by the U.S. Internal Revenue Service ("IRS") as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."[21]

28.    The Organization for Economic Co-Operation and Development ("OECD") guidance for financial transactions states that "in applying the arm's length principle to a financial transaction it is necessary to consider the conditions that independent parties would have agreed to in comparable circumstances."[22]

29.    Accordingly, the United States Department of Labor, which has enforcement authority over Section 408 of ERISA, has defined a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign

---

[20]    *Value, fair market value*, Black's Law Dictionary (12th ed. 2024).

[21]    26 C.F.R. §20-2031-1(b).

[22]    OECD, *Transfer Pricing Guidance on Financial Transactions: Inclusive Framework on BEPS: Actions 4, 8-10* (Feb. 2020), https://perma.cc/TNY9-9GK2.

short term debt (*e.g.*, in the U.S., Treasury bills), all in the jurisdiction where the rate is being evaluated."[23]

30.    Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[24]    In making this determination, the IRS specifies, "[a]ll relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties."[25]    The IRS definition is of particular import because it is used in connection with assessing transfer pricing between related entities and is thus particularly applicable in evaluating transfers of customer cash between Defendants and the Program Banks.

31.    Consistent with these common-sense definitions, a reasonable sweep rate is one that takes into account market rates for products in arm's-length transactions, rates applicable to short-term instruments like repurchase agreements, and other short-term benchmark rates, including the federal funds rate and Treasury bills.

32.    By a variety of objective measures, Defendants paid unreasonably low, below-market interest rates under the Sweep Programs throughout the relevant time period.    For example, between 2022 and 2023, rates under the BDSP ranged from 0.01% to 0.51% for customers with cash balances of less than $500,000 ("Tier 1") and increased only marginally from a low of 0.01%

---

[23]    Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646, 34648 (June 10, 2003).

[24]    26 C.F.R. §1.482-2(a)(2).

[25]    *Id.*

to 0.76% on all customer balances between $500,000 and $1,000,000 ("Tier 2").[26]  During the

same period, however, market rates for similar products, rates for short-term instruments, and other

short-term interest rate benchmarks skyrocketed.  For one, the federal funds rate (the rate banks

charge to borrow from each other overnight) rose from a low of nearly zero to a 20-year high of

around 5.33%.  In fact, still today, the federal funds effective rate remains around 4.33%, far

exceeding the current BDSP rates, which are as low as 0.43%.[27]

33.    The following table presents a non-exhaustive sample of the rates paid to customers

in the BDSP during the relevant time period:

| Deposit Balance | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| Less than $500,000 | 0.01% | 0.51% | 0.50% | 0.43% |
| $500,000 to $999,999 | 0.01% | 0.76% | 0.75% | 0.64% |
| $1,000,000 to $4,999,999 | 0.01% | 1.27% | 1.25% | 1.06% |
| $5,000,000 to $9,999,999 | 0.01% | 2.03% | 2.00% | 1.70% |
| Greater than $9,999,999 | 0.01% | 2.79% | 2.75% | 2.34% |

34.    The RSP employs a level payment structure that pays a single interest rate to all

accounts in RSP, rather than a tiered structure where different rates are paid to different tiers of

account balances.  The following table presents a non-exhaustive sample of the rates paid to

customers in the RSP during the relevant time period:

| Deposit Balance | 2023 | 2024 | 2025 |
|---|---|---|---|
| Greater than $0 | 1.72% | 1.18% | 1.51% |

---

[26]  For customers of the BDSP with account balances between $1,000,000 and $5,000,000 ("Tier 3"), the current interest rate is 1.06%; 1.70% for balances from $5,000,000 to $10,000,000 ("Tier 4"); and 2.34% for balances greater than $10,000,000 ("Tier 5").

[27]  NewEdge Capital Group, *Bank Sweep Program: Current Yields*, https://www.newedgecapitalgroup.com/currentyields/ (last visited June 5, 2025).  For BDSP customers with balances of $1 million and above, Defendants' current interest rates are: 1.06% for balances from $1,000,000 to $4,999,999; 1.70% for balances from $5,000,000 to $9,999,999; and 2.34% for balances of $10,000,000 and greater.

35.     As explained in further detail below, the rates paid under the Sweep Programs have been and remain *significantly* below several objective benchmarks of reasonableness, including, by way of example, federal benchmark rates, competitors' rates on other interest-bearing accounts, rates on NewEdge's other interest-bearing products, and rates paid by other sweep programs.

### A.     Federal Benchmark Rates

36.     The rates paid under the Sweep Programs consistently have been and remain unreasonably low relative to federal benchmark rates.

37.     Federal benchmark interest rates, including the federal funds target rate, are an appropriate point of comparison for the reasonableness of Defendants' interest rates.  Indeed, as the Board of Governors of the Federal Reserve System ("Federal Reserve") explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."[28]

38.     Other broker-dealers have expressly acknowledged the influence of the federal funds rate on sweep rates.  For example, R.W. Baird's sweep program disclosure states that "interest rate changes will generally be made on a monthly basis and in response to changes in the Federal Funds Target Rate."[29]  Similarly, Fidelity's sweep program disclosure states that the sweep rate "will generally be tied to the London Interbank Offered Rate (LIBOR), the Federal Funds

---

[28]   Board of Governors of the Federal Reserve System, *Economy at a Glance – Policy Rate* (May 8, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm#:~:text=affect%20the%20economy%3F-,Changes%20in%20the%20target%20range%20for%20the%20federal%20funds%20rate,activity%2C%20employment%2C%20and%20inflation.

[29]   R.W. Baird, *Cash Sweep Program Disclosure* (June 2025), https://www.rwbaird.com/globalassets/pdfs/help/cash-sweep-program-disclosure.pdf.

Effective Rate (FFE), or Federal Funds Target Rate (FFT)" and "may span a spectrum of up to 0.75% above or below LIBOR, FFE, or FFT."[30]

39.    Despite precipitous increases in the federal funds target rate in recent years, however, the rates paid under the Sweep Programs barely changed, if at all.  For instance, between January 2022 and August 2023, the Federal Reserve increased the federal funds target range 11 separate times, culminating at a target range of 5.25% to 5.50%, the highest in nearly two decades. Yet, during that same period, the rates paid under the Sweep Programs increased only marginally.

40.    By comparison, short-term interest rates for other federal financial instruments, including Treasury bills, experienced steep rate increases in 2022 and 2023, as the Federal Reserve hiked the federal funds rate.  For purposes of illustration, the following charts depict the three-month and one-year Treasury bill rates between 2017 and today:

*Three-Month Treasury Bill Rates (2017 to Present)*



---

[30]  Fidelity, *Fidelity Cash Management Account FDIC-Insured Deposit Sweep Program Disclosure*,        https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/ fcma_disc.pdf (last visited June 5, 2025).

*One-Year Treasury Bill Rates (2017 to Present)*



41.     The overnight interest rate at which the Federal Reserve repurchases securities from private banks (the "repo" rate), currently at 4.33%, similarly increased together with the federal funds rate beginning in 2022.  For purposes of illustration, the following graph depicts the repo rates between 2017 and today:

*Overnight Repo Rates (2017 to Present)*



42.     As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the federal funds rate beginning in 2022.

**B.    Rates Paid by Competitors' Interest-Bearing Deposit Accounts**

43.    The rates paid under the Sweep Programs have also been significantly lower than rates paid by interest-bearing deposit accounts at other institutions.

44.    Rates on interest-bearing deposit accounts at other institutions are an appropriate comparator for determining a reasonable sweep-program interest rate because deposit accounts' rates typically conform to changing economic and business conditions (*e.g.*, changing federal benchmark rates) – the same conditions to which the rates paid under the Sweep Programs purportedly adhere.

45.    Informa Research Services ("Informa"), which compiles data on interest rates paid by U.S. banks on various deposit accounts, has published data showing that the interest rates for 50 of the largest FDIC-insured banks in the United States correlate with the federal funds rate, unlike the cash sweep rates paid under the Sweep Programs.

46.    Significantly, Informa's data shows that interest rates for online money market deposit accounts ("MMDAs") from 2022 to the present have been substantially higher than the rates Defendants paid to Plaintiffs and Class members. According to this data, unlike the rates paid under the Sweep Programs, the rates paid by online banks reflected changes in the federal funds rate.

47.    The following is a summary of the data made available by Informa for the period January 2022 through May 2025 for deposits in excess of $50,000 for the top 50 national banks in size and 74 prominent online banks:

| Date | Top 50 Avg. APY | Internet Avg. APY | Fed. Funds Rate |
|---|---|---|---|
| 07-Jan-22 | 0.08 | 0.24 | 0.08 |
| 04-Feb-22 | 0.08 | 0.25 | 0.08 |
| 04-Mar-22 | 0.08 | 0.26 | 0.20 |
| 01-Apr-22 | 0.08 | 0.26 | 0.33 |
| 06-May-22 | 0.09 | 0.28 | 0.77 |
| 03-Jun-22 | 0.10 | 0.34 | 1.21 |

| 01-Jul-22 | 0.15 | 0.45 | 1.68 |
| 05-Aug-22 | 0.22 | 0.62 | 2.33 |
| 02-Sep-22 | 0.26 | 0.72 | 2.56 |
| 07-Oct-22 | 0.38 | 0.89 | 3.08 |
| 04-Nov-22 | 0.44 | 1.06 | 3.78 |
| 02-Dec-22 | 0.59 | 1.26 | 4.10 |
| 06-Jan-23 | 0.73 | 1.43 | 4.33 |
| 03-Feb-23 | 0.78 | 1.55 | 4.57 |
| 03-Mar-23 | 0.78 | 1.61 | 4.65 |
| 07-Apr-23 | 0.83 | 1.68 | 4.83 |
| 05-May-23 | 0.86 | 1.72 | 5.06 |
| 02-Jun-23 | 0.93 | 1.79 | 5.08 |
| 07-Jul-23 | 0.95 | 1.83 | 5.12 |
| 04-Aug-23 | 0.99 | 1.88 | 5.33 |
| 01-Sep-23 | 1.00 | 1.92 | 5.33 |
| 06-Oct-23 | 1.01 | 1.99 | 5.33 |
| 03-Nov-23 | 1.04 | 1.95 | 5.33 |
| 01-Dec-23 | 1.07 | 1.95 | 5.33 |
| 05-Jan-24 | 1.04 | 2.05 | 5.33 |
| 02-Feb-24 | 0.95 | 2.05 | 5.33 |
| 01-Mar-24 | 0.92 | 2.01 | 5.33 |
| 05-Apr-24 | 0.90 | 2.00 | 5.33 |
| 03-May-24 | 0.89 | 2.10 | 5.33 |
| 07-Jun-24 | 0.89 | 2.10 | 5.33 |
| 05-Jul-24 | 0.89 | 2.14 | 5.33 |
| 02-Aug-24 | 0.88 | 2.14 | 5.33 |
| 06-Sep-24 | 0.87 | 2.14 | 5.13 |
| 04-Oct-24 | 0.80 | 2.03 | 4.83 |
| 01-Nov-24 | 0.80 | 2.07 | 4.64 |
| 06-Dec-24 | 0.77 | 2.05 | 4.48 |
| 03-Jan-25 | 0.73 | 1.99 | 4.33 |
| 07-Feb-25 | 0.72 | 1.98 | 4.33 |
| 07-Mar-25 | 0.73 | 2.01 | 4.33 |
| 04-Apr-25 | 0.72 | 2.01 | 4.33 |
| 02-May-25 | 0.73 | 1.99 | 4.33 |

48.    As shown above, as the Federal Reserve increased the federal funds target range throughout 2022 and 2023, average rates offered for deposits in excess of $50,000 increased across the board. In fact, by December 2023, the average rates paid by the top 50 national banks in size and 74 prominent internet banks reached 1.07% and 1.95%, respectively. Meanwhile, during the

same period, the rates paid to customers in Tier 1 and Tier 2 of the BDSP changed only marginally from 0.01% to 0.51% and 0.01% to 0.76%, respectively.

49.    National averages for deposits in excess of $10,000 similarly exceeded rates offered under the Sweep Programs between January 2022 and May 2025.  The following is a summary of the data made available by Informa for the period January 2022 and May 2025 for the average rate on deposits in excess of $10,000 for the same group of banks:

| Date | Top 50 Avg. APY | Internet Avg. APY | Fed. Funds Rate |
|---|---|---|---|
| 7-Jan-22 | 0.07 | 0.22 | 0.08 |
| 4-Feb-22 | 0.07 | 0.22 | 0.08 |
| 4-Mar-22 | 0.07 | 0.23 | 0.08 |
| 1-Apr-22 | 0.08 | 0.24 | 0.33 |
| 6-May-22 | 0.08 | 0.26 | 0.83 |
| 3-Jun-22 | 0.10 | 0.32 | 0.83 |
| 1-Jul-22 | 0.15 | 0.41 | 1.58 |
| 5-Aug-22 | 0.21 | 0.56 | 2.33 |
| 2-Sep-22 | 0.25 | 0.66 | 2.33 |
| 7-Oct-22 | 0.35 | 0.77 | 3.08 |
| 4-Nov-22 | 0.41 | 0.94 | 3.83 |
| 2-Dec-22 | 0.53 | 1.07 | 3.83 |
| 6-Jan-23 | 0.61 | 1.21 | 4.33 |
| 3-Feb-23 | 0.66 | 1.27 | 4.58 |
| 3-Mar-23 | 0.67 | 1.35 | 4.57 |
| 7-Apr-23 | 0.72 | 1.40 | 4.83 |
| 5-May-23 | 0.74 | 1.43 | 5.08 |
| 2-Jun-23 | 0.78 | 1.49 | 5.08 |
| 7-Jul-23 | 0.80 | 1.52 | 5.08 |
| 4-Aug-23 | 0.85 | 1.56 | 5.33 |
| 01-Sep-23 | 0.86 | 1.59 | 5.33 |
| 06-Oct-23 | 0.91 | 1.60 | 5.33 |
| 03-Nov-23 | 0.92 | 1.59 | 5.33 |
| 01-Dec-23 | 0.95 | 1.62 | 5.33 |
| 05-Jan-24 | 0.95 | 1.69 | 5.33 |
| 02-Feb-24 | 0.86 | 1.69 | 5.33 |
| 01-Mar-24 | 0.83 | 1.65 | 5.33 |
| 05-Apr-24 | 0.83 | 1.64 | 5.33 |
| 03-May-24 | 0.82 | 1.75 | 5.33 |
| 07-Jun-24 | 0.82 | 1.75 | 5.33 |
| 05-Jul-24 | 0.81 | 1.79 | 5.33 |
| 02-Aug-24 | 0.81 | 1.80 | 5.33 |
| 06-Sep-24 | 0.80 | 1.82 | 5.13 |

| | | | |
|---|---|---|---|
| 04-Oct-24 | 0.73 | 1.76 | 4.83 |
| 01-Nov-24 | 0.76 | 1.82 | 4.64 |
| 06-Dec-24 | 0.72 | 1.81 | 4.48 |
| 03-Jan-25 | 0.69 | 1.75 | 4.33 |
| 07-Feb-25 | 0.68 | 1.75 | 4.33 |
| 07-Mar-25 | 0.67 | 1.80 | 4.33 |
| 04-Apr-25 | 0.66 | 1.80 | 4.33 |
| 02-May-25 | 0.67 | 1.77 | 4.33 |

50.     Like the average rates for deposits in excess of $50,000, these rates increased as the Federal Reserve increased the federal funds rate.  Meanwhile, during the same period, the paltry rates paid to Sweep Programs customers changed only marginally, as discussed above.

**C.     Rates Paid by Competitors' Cash Sweep Programs**

51.     The rates paid under the Sweep Programs have also remained substantially lower than the rates paid by competitors' sweep programs.

52.     For example, Fidelity, NFS's parent company, and R.W. Baird are two brokerages that also sweep cash to unaffiliated banks, yet both pass along substantially higher rates on swept cash than Defendants.  Starting in August 2023, Fidelity paid investors as much as 2.72% APY on swept cash, regardless of cash balances, and R.W. Baird paid investors (as of September 8, 2023) 2.07% to 4.15% on swept cash, depending on cash balances.

53.     Other brokerage firms also offer significantly higher rates than defendants. For example, Interactive Brokers, WeBull, and Vanguard each sweep cash to unaffiliated brokers and offer substantially higher rates than Defendants: Interactive Brokers pays up to 4.83% on swept cash, WeBull pays 5%, and Vanguard pays 3.7%.

54.     The disparity between these benchmarks, individually and collectively, and the rates paid under the Sweep Programs show that the rates were unreasonable.  As a result of the foregoing, Plaintiff and the Class (defined below) suffered, and continue to suffer, damages by

receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**D.    Rates Paid by Sweep Programs Sweeping Cash to Money Market Funds**

55.    The interest rates paid by the Sweep Programs have also paled in comparison to the rates paid by government money market funds ("MMFs").  Government MMFs are an appropriate comparator for assessing the reasonableness of the rate paid on a sweep deposit account because they are common alternative sweep options with the same or better risk profiles as sweep deposit accounts.

56.    Defendants previously allowed eligible accounts to sweep to higher-yielding MMFs, but they discontinued that practice in or around August and October 2023 in favor of sweeping solely to Deposit Accounts at the Program Banks.  Today, Defendants sweep customer cash into MMFs only under limited circumstances.  If, for example, the Program Banks are unwilling or unable to accept new or maintain existing deposits, Defendants will automatically sweep customer cash into the Fidelity Government Money Market: "S" Class fund ("FZSXX"), which currently pays a 7-day yield of 3.96%.  Defendants thus have the ability and discretion to offer MMFs as a primary sweep option, but have restricted client choice in order to generate additional revenue for themselves at the expense of customers.

57.    The SEC has recognized that MMFs are frequently used as sweep products.  In an administrative proceeding, for example, the SEC observed, "Money market funds generally invest in short term, highly liquid securities with limited credit risk, and are frequently used in Sweep

Accounts as cash sweep vehicles."[31]   Similarly, in an Investor Bulletin regarding Bank Sweep

Programs dated June 5, 2014, the SEC explained,

> One option, a bank sweep program, typically involves the automatic transfer (or "sweep") of cash in the brokerage account into a deposit account at a bank that may or may not be affiliated with the broker-dealer.  Other options include leaving cash in the brokerage account, or sweeping cash to one or more money market mutual funds.[32]

58.     A 2016 bulletin from the Office of the Comptroller of the Currency also urged

banks to use government MMFs as sweep options:

> Banks that offer sweep arrangements between deposit accounts and MMFs [footnote omitted.] should assess the respective processing characteristics, system requirements, compliance requirements, and liquidity characteristics of government, retail, and prime MMFs. Based on operational and liquidity considerations, most banks will likely conclude that once the SEC's MMF reforms are fully implemented, government funds are the only practical option for bank deposit to MMF sweep arrangements.[33]

59.     MMFs are appropriate alternatives to FDIC-insured sweep deposit accounts

because they are exceedingly low-risk investment vehicles. According to SEC Rule 2a-7(a)(14),

the principal rule governing MMFs, government MMFs are required to invest at least 99.5% of

their total assets in cash, Treasury securities, or fully collateralized repurchase agreements (repos).

Moreover, MMFs are required to invest in short-term investments, which are defined as securities

---

[31]   *See, e.g.*, *In re Cowen Prime Advisors LLC*, Investment Advisers Act of 1940, SEC Release No. 5874 (SEC Sept. 27, 2021), https://www.sec.gov/files/litigation/admin/2021/ia-5874.pdf.

[32]   U.S. Securities and Exchange Commission, *Investor Bulletin: Bank Sweep Programs* (June 5, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_banksweep.

[33]   Office of the Comptroller of the Currency, *OCC Bulletin 2016-17: Money Market Funds: Compliance with SEC Money Market Fund Rules by Bank Fiduciaries, Deposit Sweep Arrangements, and Bank Investments* (May 19, 2016), https://perma.cc/W9Z7-UXXY.

with maturities no greater than 397 days.  The SEC further requires the dollar-weighted average maturity of the securities owned by a MMF to not exceed 60 days.[34]

60.     Treasuries are backed by the full faith and credit of the U.S. government. Accordingly, Treasuries are risk-free investments that carry essentially no credit risk.  Moreover, portfolios with average maturities of 90 days or less are short-term and so subject to a negligible amount of interest rate risk.  Because government MMFs invest solely in short-term government securities or cash, government MMFs are essentially risk-free and have never lost money.  For these reasons, government MMFs have the same or better risk profile as FDIC-insured accounts with assets under the insurable limits set by the FDIC.[35]

61.     In its Final Regulations with respect to prime money market reforms,[36] the SEC noted that as of March 2023, 78% of all MMFs were invested in government or Treasury MMFs, comprising over $4.4 trillion in assets.  In addition, the SEC emphasized the stability of government and Treasury MMFs:

> Government money market funds . . . tend to have counter-cyclical flows. Specifically, during times of market turmoil and volatility, investors – particularly institutional investors – tend to shift their investments to government money market funds.  [footnote omitted.] These money market funds offer investments with high credit quality and liquidity, as well as an explicit guarantee for certain government

---

[34]  *See* 17 C.F.R. § 270.2a-7(c)(2).

[35]  As further evidence, *see* the article by SEC staff, Viktoria Baklanova, Isaac Kuznits, Trevor Tatum, *Money Market Funds in the Treasury Market* (Sept. 1, 2022), https://www.sec.gov/files/mmfs-treasury-market-090122.pdf (showing that "assets in government MMFs more than doubled in 2016 following implementation of the 2014 MMF reforms and increased considerably once again in the first half of 2020, when demand for government assets surged amidst the COVID-19 pandemic (Figure 1).").  This suggests that government MMFs, like bank deposits, have generally low default risk.

[36]  Securities and Exchange Commission, *Money Market Fund Reforms; Form PF Reporting Requirements for Large Liquidity Fund Advisers; Technical Amendments to Form N-CSR and Form N-1A*, 17 C.F.R. Parts 270, 274, and 279 (Oct. 2, 2023), https://www.sec.gov/files/rules/final/2023/33-11211.pdf.

securities (*e.g.*, Treasuries) and a perceived implicit guarantee for others (*e.g.*, Federal Home Loan Bank securities). As shown below, these funds experienced inflows during the global financial crisis of 2008, Euro debt crisis of 2011, Covid-19 pandemic of 2020 and the bank crisis in 2023.[37]

62.    Academic literature further supports the equivalence of MMFs and FDIC-insured accounts. For example, Federal Reserve economists state that MMFs and bank deposits are "close substitutes from an investor's perspective."[38]

63.    Defendants, for their part, have likewise acknowledged that FDIC-insured deposit accounts and MMFs can be used interchangeably as sweep options.[39] Specifically, Defendants define the "Core Account Sweep Vehicles" as encompassing "[c]ash and cash alternatives, such as institutional and 'sweep' money market funds and bank deposit sweep programs[.]"[40]

64.    Despite these similarities, brokerages that sweep cash to MMFs pay substantially higher rates of interest than the FDIC-insured Deposit Accounts under the Sweep Programs offered by Defendants. For example, in 2023, Fidelity swept customer cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investors cash into its Vanguard Federal Money Market Fund (VMFXX). Both Fidelity and Vanguard government MMFs have minimal risk that is equivalent to FDIC-insured accounts.[41] Nevertheless, while the Sweep

---

[37]    *Id.* at 182.

[38]    Gara Afonso, Marco Cipriani, et al., *Monetary Policy Transmission and the Size of the Money Market Fund Industry: An Update*, Fed. Rsrv. Bank of NY (Apr. 3, 2023), https://libertystreeteconomics.newyorkfed.org/2023/04/monetary-policy-transmission-and-the-size-of-the-money-market-fund-industry-an-update/.

[39]    *See generally* NewEdge Wealth, *Part 2A of Form ADV: Firm Brochure* (Feb. 21, 2024), https://www.newedgewealth.com/wp-content/uploads/NEW-Firm-Disclosure-Brochure-Feburary-21-2024.pdf ("Firm Brochure").

[40]    *Id.* at 16.

[41]    *See* 17 C.F.R. §270.2a-7(a)(11).

Programs paid rates as low as 0.51% and no higher than 2.79% in 2023, SPAXX (Fidelity) and VMFXX (Vanguard) paid, respectively, highs of 4.99% (regardless of account balances) and 5.30% (based on initial deposits exceeding $3,000) during the same year.

65.     In addition to paying higher rates through MMFs, Fidelity and Vanguard pay higher rates on sweep deposit accounts than the rates paid on Deposit Accounts under the Sweep Programs.  Today, for example, Fidelity pays all customers 2.21% on cash swept to FDIC-insured deposit accounts and Vanguard pays all customers 2.50% on cash swept to FDIC-insured deposit accounts.  Meanwhile, Defendants limit the availability of a comparable rate (2.34%) to customers with more than $10,000,000 in cash deposits in the BDSP.  Otherwise, the rates offered under the BDSP and RSP are significantly lower than the rates offered to all customers at Fidelity and Vanguard on cash swept to FDIC-insured deposit accounts.

66.     Pressure from the SEC has also prompted other financial institutions to consider MMF yields in setting sweep rates.  For example, Wells Fargo & Company, responding to pressure from an SEC investigation into its managed accounts, raised certain sweep rates in order to make them, in its words, "better align[ed] with rates paid in money market funds."[42]

67.     The substantially higher yields offered by government MMFs as sweep options is strong evidence that Defendants' rates are not reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to the Sweep Programs**

68.     Defendants breached several contractual obligations through the payment of unreasonably low rates of interest.

---

[42]   *WFC Faces Lawsuit Over Interest Rates on Cash Sweep Accounts*, Zacks Equity Research (Sept. 27, 2024), https://perma.cc/7F2C-QGYN.

A.    **Defendants' Obligation to Pay and Secure Rates Based on Economic and Business Conditions**

69.    For all customers in the Sweep Programs, Defendants promised the interest rates paid were based upon "economic" and "market" conditions.[43]  By making this representation, Defendants promised the rates would reflect an arm's-length rate secured on the short-term interest-rate marketplace.

70.    During the relevant period, however, the rates paid under the Sweep Programs barely changed, if at all, even while short-term interest rate conditions improved drastically.  As discussed above, between January 2022 and August 2023, the Federal Reserve increased the federal funds target range 11 times.  Though all other short-term interest rates increased after each rate hike, the rates paid under the Sweep Programs only marginally increased.

71.    As the foregoing reflects, the rates paid under the Sweep Programs were not determined based on business and economic conditions.  Instead, the rates were determined based on the desire of Defendants and the Program Banks to maximize profits at the expense of their customers.

B.    **Defendants' Obligations to Pay Reasonable Rates to All Sweep Programs Customers**

72.    In addition, the Program Documents obligated NewEdge and NFS to pay reasonable rates to all customers under the Sweep Programs.

73.    NewEdge and NFS agreed to act as the agents of customers in the Sweep Programs under the terms of the Program Documents discussed above.[44]  As agents, NewEdge and NFS exercised full discretion, management, and control over the cash deposited on behalf of customers

---

[43]    NewEdge, *Disclosure Document*, *supra* note 2, at 10.

[44]    NewEdge, *Disclosure Document*, *supra* note 2.

in the Sweep Programs, including by selecting the Program Banks that received the cash, negotiating the rate of interest to be paid on the Deposit Accounts, sweeping the cash into the Program Banks, and unilaterally deciding the fee they wanted to extract from the interest accrued on the Deposit Accounts.

74.    As agents under the Program Documents, NewEdge and NFS were contractually obligated to act in their customers' best interests in paying themselves reasonable fees and paying customers reasonable interest rates and yields under the Sweep Programs.  In other words, reasonableness was implicit in the Program Documents and governed the sweep interest rates and yields paid to customers in the Sweep Programs.  However, NewEdge and NFS failed to act in their customers' best interests because, as discussed above, the sweep interest rates and yields were unreasonable compared to several objective benchmarks.

75.    NewEdge and NFS also owed customers contractual duties under the implied covenant of good faith and fair dealing, which precluded them from frustrating and unfairly interfering with their customers' right to receive the benefits of the contract.  NewEdge and NFS violated these duties when they acted in bad faith and abused their discretion by paying customers unreasonable sweep interest rates that were well below several objective benchmarks, including the federal funds rate (which rose dramatically as the sweep interest rates essentially remained the same) and competitors' rates, and by extracting unreasonable and unjustified fees from the sweep interest accrued on customers' Deposit Accounts.

### C.    Defendants' Obligation to Pay Reasonable Rates to Retirement Customers

76.    The Program Documents also required Defendants to pay reasonable rates of return on retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were incorporated into the Program Documents.  For example, the Program Documents stated: "Although we or NFS may use other

methods when we determine they may be more appropriate, we or NFS reserve the right to use the provisions described in this section at any time, except in cases involving retirement accounts when these provisions would conflict with the Employee Retirement Income Security Act of 1974 (ERISA) or the Internal Revenue Code of 1986, both as amended."[45]

77.    For RSP account holders, Defendants previously acknowledged their duty to pay reasonable rates of interest, stating,

> Applicable law governing retirement accounts, such as qualified plans under ERISA, and individual retirement accounts under the Internal Revenue Code, necessitates that interest rates paid by the Program Banks for deposits in the Deposit Accounts, our fee, and other service fees are negotiated at arm's length, are believed to be fair and reasonable, and are designed to approximate value for the services involved and in the context of customers' eligible assets.[46]

78.    Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."[47]  A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[48]

---

[45]   National Financial Services LLC, *Customer Agreement*, *supra* note 1 at 5.

[46]   NewEdge Advisors, *Part 2A of Form ADV: Firm Brochure* (Mar. 14, 2022) at 27.

[47]   26 U.S.C. §4975(c)(1)(D)-(F).

[48]   26 U.S.C. §4975(e)(2)(A)-(B).

79.     Therefore, NewEdge and NFS were each a "disqualified person" under Section 4975 of the IRC because they were a fiduciary and service provider of retirement account customers in connection with the Sweep Programs.  Because each was a disqualified person, cash sweeps from retirement accounts to the Program Banks, for the benefit of Defendants and the Program Banks, were "prohibited transactions" under Section 4975 of the IRC.

80.     The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."[49]  However, cash sweeps under the Sweep Programs were not exempt because the Program Banks did not pay reasonable sweep interest rates, as discussed above.

81.     Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate."[50]  This exemption did not apply because the Program Banks did not pay reasonable sweep interest rates.

82.     Thus, Defendants' cash sweeps from retirement accounts in the Sweep Programs violated the IRC, ERISA, and the contractual provisions of the Program Documents that incorporated the IRC and ERISA.

83.     As described above, both the IRC and ERISA prohibit NewEdge from investing retirement customer cash in deposit accounts that do not bear a reasonable rate of interest.  Such a "prohibited transaction" is subject to a 15% tax and other potential penalties on otherwise tax-deferred retirement assets.

---

[49]   26 U.S.C. §4975(d)(4).

[50]   29 U.S.C. §1108(b)(4).

84.     By investing customer cash in deposit accounts paying unreasonably low rates of interest, Defendants frustrated the purpose of the Program Documents.  That is, through their failure to secure or pay reasonable rates of interest under the Sweep Programs, Defendants placed retirement customers at the risk of unforeseen taxes on retirement assets.

**Defendants Breached Their Fiduciary Duties Related to the Sweep Programs**

85.     In addition to their contractual obligations, NewEdge and NFS breached their fiduciary duties related to the Sweep Programs.  NewEdge and NFS acted as agents in connection with the Sweep Programs because they accepted special compensation in exchange for the exercise of managerial discretion over cash deposits in the Sweep Programs.  NewEdge and NFS exercised full managerial discretion over customer cash, including by unilaterally choosing the participating Program Banks, sweeping cash deposited by customers into the Deposit Accounts, setting interest rate tiers and coordinating with the Program Banks to set and reset the interest rates paid on customer deposits in the Sweep Programs, and extracting fees from the interest accrued on the Deposit Accounts.

86.     As the agents of customers in the Sweep Programs, NewEdge and NFS owed similar fiduciary duties, including the duties arising under common law and outlined under Regulation Best Interest, 17 C.F.R. §240.15l-1, which individually and collectively required them to act in their retail customers' best interests and prohibited them from placing their own interests ahead of their retail customers' interests. [51]

87.     However, as discussed above, NewEdge and NFS violated these fiduciary duties by failing to act in their customers' best interests, and by placing their own interests ahead of their

---

[51] *See* Securities and Exchange Commission, *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

customers' interests, when they enriched themselves, NCG, and the Program Banks by providing customers in the Sweep Programs with unreasonably low interest rates well below several objective benchmarks discussed above, and by paying themselves unreasonable, arbitrary, and unjustified fees extracted from the interest accrued on customers' Deposit Accounts.

88.     NewEdge and NFS also violated their fiduciary duties by employing the Sweep Programs scheme to deceive, defraud, and manipulate customers.  NewEdge and NFS paid unreasonably low interest rates to customers in the Sweep Programs in order to maximize Defendants' and the Program Banks' financial benefits from the Sweep Programs.  To conceal this scheme, NewEdge and NFS intentionally deceived, defrauded, and manipulated customers in the Sweep Programs by making materially false and misleading statements and omissions about the Sweep Programs (discussed further below) in the Program Documents posted on NewEdge's public website and distributed to customers throughout the United States.

**Defendants Made Material Misrepresentations and Omissions Regarding the Sweep Programs**

89.     In the Program Documents, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich themselves and the Program Banks by providing unreasonably low interest rates and yields to customers in order to increase their own financial benefits from the Sweep Programs and by extracting unreasonable unjustified, and arbitrary fees and otherwise failing to negotiate, secure, and pass along reasonable sweep interest rates to customers in the Sweep Programs.

90.     The Program Documents also misleadingly stated, "[I]nterest rates on each Deposit Accounts are tiered . . . and ***will vary based upon prevailing economic and business conditions***."[52]

---

[52]    NewEdge, *Disclosure Document*, *supra* note 2 at 2.

This statement was misleading and omitted material facts because, in reality, the Sweep Programs *always* paid below-market and unreasonably low interest rates rather than interest rates based on "market" or "economic" conditions or rates otherwise reflecting an arm's length transaction. Indeed, as discussed above, the sweep interest rates offered under the Sweep Programs largely remained the same, even as benchmark interest rates increased to their highest levels in nearly two decades, and always fell far below the rates paid by comparable products.

91.     Further, the Program Documents misleadingly stated,

> Over any given period, the interest rates on the Program Deposits may be lower than the rate of return on other core account investment vehicles which are non-FDIC-insured or on bank account deposits offered outside of the Program. Program Banks do not have a duty to offer the highest rates available or rates that are comparable to Money Funds.[53]

92.     These statements were misleading and omitted material facts because, in reality, the Program Banks *always* offered competitive rates comparable to MMFs on the Deposit Accounts, Defendants *always* retained a lion's share of the rates paid by the Program Banks in the form of a fee, and Defendants accordingly *always* passed along rates of interest significantly below market alternatives, including MMFs. Today, as an example, the Program Banks pay, on average, around 4.33% on customer cash in the BDSP – far exceeding the 7-day yield of 3.96% offered by FZSXX (the Fidelity MMF used as an automatic sweep vehicle in the limited circumstances discussed above). But customers only receive a small portion of the competitive rates paid by the Program Banks. Most egregiously, for BDSP customers with cash balances below $500,000, NewEdge passes along only 10% of the competitive 4.33% rate paid by the Program Banks, or 0.43%, keeping the remaining 90%, or 3.90%, for itself.

---

[53] *Id.* at 10.

93.    Moreover, Defendants' statements about potentially *lower* interest rates did not excuse their contractual and fiduciary obligations to pay *reasonable* interest rates, as described above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

## CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this action as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all customers of Defendants who had cash deposits or balances in the Sweep Programs.  Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

95.    The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because Defendants provide services across the United States.

96.    Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

97.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

98.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would

establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

99.    Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

101.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether NewEdge and NFS owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)    whether NewEdge and NFS breached its fiduciary duties to members of the Class in connection with the Sweep Programs;

(d)    whether NewEdge and NFS breached its contractual obligations to members of the Class in connection with the Sweep Programs;

(e)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(f)    whether Defendants were unjustly enriched by their wrongful conduct;

(g)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(h)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

### Breach of Fiduciary Duty
### Against All Defendants

102.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

103.    During the relevant time period, NewEdge and NFS were the agents of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  ECH and NCG owned and controlled NewEdge.

104.    NewEdge and NFS owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

105.    NewEdge and NFS violated their duties to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves, ECH, NCG, and the Program Banks at the expense of customers by paying customers unreasonably low interest rates and extracting unreasonable fees from interest accrued on customers' Deposit Accounts, as described above.

106.    NewEdge and NFS also violated their duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Program Documents and NewEdge's regulatory disclosures, as described above.

107.    Further, NewEdge and NFS violated their duties to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Program Documents and NewEdge's regulatory disclosures, which were materially misleading and omitted material facts for the reasons described above.

108.    As a direct and proximate result of NewEdge and NFS's breaches of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

**COUNT II**

**Breach of Contract**
**Against All Defendants**

109.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

110.    Plaintiff and Class members were parties to the Customer Agreement, which incorporated the terms of Disclosure Document.  The Customer Agreement and the Disclosure Document set forth the contractual terms and conditions of the Sweep Programs.

111.    Under the Customer Agreement and Disclosure Document, NewEdge and NFS were contractually obligated to act as agents on behalf of Plaintiff and the Class, and, thus, were contractually obligated to act in Plaintiff's and the Class' best interests in providing reasonable sweep interest rates and yields under the Sweep Programs and extracting reasonable fees from the rates paid by the Program Banks under the Sweep Programs.  ECH and NCG owned and controlled NewEdge.

112.    NewEdge and NFS breached their contractual obligations by (i) extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the Deposit Accounts and (ii) failing to provide Plaintiff and the Class with reasonable sweep interest rates and yields on their deposits in the Sweep Programs.  Rather, the sweep interest rates provided by NewEdge and

NFS were unreasonably low and well below several objective benchmarks including the federal funds rate, which increased dramatically during the Class Period while the interest rates paid to customers in the Sweep Programs largely remained flat. As such, NewEdge and NFS denied Plaintiff and the Class the full benefit of their bargain under the Customer Agreement.

113.    NewEdge and NFS additionally promised that the sweep rates for all customers under the Sweep Programs will be based upon "economic" and "market" conditions.[54] However, the sweep rates provided did not reflect the improving market conditions, including the skyrocketing federal funds rate. As such, Defendants' sweep rates were not determined based on economic and market conditions. Instead, the sweep rates were determined based on Defendants' and the Program Banks' motivation to earn profits at the expense of their customers.

114.    As a direct and proximate result of NewEdge and NFS's breaches of contract, Plaintiff and the Class sustained damages.

### COUNT III

**Breach of Implied Covenant of Good Faith and Fair Dealing
Against All Defendants**

115.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

116.    Plaintiff and Class members were parties to the Customer Agreement, which incorporated the terms of Disclosure Document. The Customer Agreement and the Disclosure Document set forth the contractual terms and conditions of the Sweep Programs.

117.    Implicit in the Customer Agreement and Disclosure Document were duties of good faith and fair dealing. NewEdge and NFS breached their duties of good faith and fair dealing by (i) paying themselves unreasonable, unjustified, and arbitrary fees and (ii) failing to provide

---

[54]    NewEdge, *Disclosure Document*, *supra* note 2, at 10.

Plaintiff and the Class with reasonable interest rates and yields on their cash deposits in the Sweep Programs.  Rather, the sweep interest rates and yields provided by Defendants and the Program Banks were well below several objective benchmarks including the federal funds rate, which increased dramatically during the Class Period while the sweep interest rates largely remained flat. As such, NewEdge and NFS acted in bad faith and denied Plaintiff and the Class the full benefit of their bargain under the Customer Agreement.  ECH and NCG owned and controlled NewEdge.

118.    As a direct and proximate result of NewEdge and NFS's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT IV

### Negligence
### Against All Defendants

119.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

120.    During the relevant time period, NewEdge and NFS were the agents of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  NewEdge and NFS facilitated the Sweep Programs by, among other things, accepting deposits from customers in the Sweep Programs and sweeping them into accounts with the Program Banks.  ECH and NCG owned and controlled NewEdge.

121.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

122.    Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act with reasonable care.

## COUNT V

### Negligent Misrepresentations and Omissions
### Against All Defendants

123.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

124.    During the relevant time period, NewEdge and NFS were the agents of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  NewEdge and NFS facilitated the Sweep Programs by, among other things, accepting deposits from customers in the Sweep Programs and sweeping them into accounts with the Program Banks.  ECH and NCG owned and controlled NewEdge.

125.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

126.    Defendants negligently made material misrepresentations and omissions in the Program Documents and NewEdge's regulatory disclosures, as described above, all of which were posted on NewEdge's public website.

127.    Plaintiff and the Class justifiably relied on Defendants' Program Documents and regulatory disclosures and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

128.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the Class.

## COUNT VI

### Unjust Enrichment
### Against All Defendants

129.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

130.    Defendants financially benefitted from the unlawful acts alleged herein by extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the cash

deposits of Plaintiff and the Class and providing Plaintiff and the Class with unreasonably low and below-market interest rates and yields under the Sweep Programs. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

131. As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

132. Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

## COUNT VII

### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law Sections 201-2(4) and 201-3 Against All Defendants

133. Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

134. Defendants' acts and practices with respect to the Sweep Programs constitute unfair, misleading, and deceptive business acts and practices within the meaning of Section 201-2(4) and in violation of Section 201-3 of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

135. In the course of their business, Defendants promised customers, *inter alia*, that the interest rates paid to customers of their Sweep Programs were based upon "economic" and "market" conditions. By making this and other representations, as alleged above, Defendants promised the rates would reflect changes in the short-term interest-rate marketplace.

136. In reliance on these promises, Plaintiff and the Class enrolled in the Sweep Programs. Indeed, customers may only participate in the Sweep Programs and deposit cash in the Deposit Accounts by entry into and acceptance of the Sweep Documents. In other words, Plaintiff and the Class could not have participated in the Sweep Programs, and Defendants could not retain

fees in connection with the Sweep Programs, but for their enrollment in and agreement to Defendants' contractual terms and conditions, which included the misrepresentations alleged above.

137.    Reliance is also presumed under Pennsylvania law because, as the agents of customers in the Sweep Programs, NewEdge and NFS owed Plaintiff and the Class fiduciary duties under Pennsylvania law and under Regulation Best Interest.

138.    Despite this fiduciary relationship, and despite the promises made to their customers, Defendants unlawfully and unfairly benefitted and enriched themselves and knowingly and intentionally misled and deceived customers in the Sweep Programs through, among other things: (a) paying unreasonably low interest rates to customers that were not based on "economic" or "market" conditions; (b) abusing the managerial discretion provided under the Sweep Programs; (c) breaching the fiduciary, contractual, and other duties arising under the Sweep Programs; and (d) making false and misleading statements and omissions relating to such interest rates and duties in the Sweep Program Documents, including those alleged above.

139.    Defendants' unfair, misleading, and deceptive acts and practices, including their misrepresentations and omissions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression that, *inter alia*, rates would reflect "economic" and "market" conditions and any deviations from such conditions were attributable only to the Program Banks' refusal to pay the highest or otherwise competitive rates, including rates comparable to MMFs.

140.    Defendants' unfair and deceptive business acts and practices with respect to the Sweep Programs adversely impacted Plaintiff and the Class, and therefore constitute consumer-oriented conduct under the UTPCPL, which resulted in direct harm to Plaintiff and the Class.

141.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiff and the Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

142.    Accordingly, Plaintiff and the Class seek appropriate relief under Section 201-9.2 of the UTPCPL, including treble damages.

### COUNT VIII

**Violation of Massachusetts General Laws Chapter 93A**
**M.G.L. ch. 93A §§ 2 and 9**
**Against All Defendants**

143.    Plaintiff incorporates paragraphs 1-101 as though fully set forth herein.

144.    Defendants' acts and practices with respect to the Sweep Programs constitute unfair, misleading, and deceptive business acts and practices within the meaning of Massachusetts General Laws Chapter 93A, Section 2.

145.    In the course of their business, Defendants promised customers, *inter alia*, that the interest rates paid to customers of their Sweep Programs were based upon "economic" and "market" conditions.  By making this and other representations, as alleged above, Defendants promised the rates would reflect changes in the short-term interest-rate marketplace.

146.    In reliance on these promises, Plaintiff and the Class enrolled in the Sweep Programs.  Indeed, customers may only participate in the Sweep Programs and deposit cash in the Deposit Accounts by entry into and acceptance of the Sweep Documents.  In other words, Plaintiff and the Class could not have participated in the Sweep Programs, and Defendants could not retain fees in connection with the Sweep Programs, but for their enrollment in and agreement to Defendants' contractual terms and conditions, which included the misrepresentations alleged above.

147.    Despite the promises made to their customers, Defendants unlawfully and unfairly benefitted and enriched themselves and knowingly, willfully, and intentionally misled and deceived customers in the Sweep Programs through, among other things: (a) paying unreasonably low interest rates to customers that were not based on "economic" or "market" conditions; (b) abusing the managerial discretion provided under the Sweep Programs; (c) breaching the fiduciary, contractual, and other duties arising under the Sweep Programs; and (d) making false and misleading statements and omissions relating to such interest rates and duties in the Sweep Program Documents, including those alleged above.

148.    Defendants' unfair, misleading, and deceptive acts and practices, including their misrepresentations and omissions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression that, *inter alia*, rates would reflect "economic" and "market" conditions and any deviations from such conditions were attributable only to the Program Banks' refusal to pay the highest or otherwise competitive rates, including rates comparable to MMFs.

149.    As a direct and proximate result of Defendants' unfair, misleading, and deceptive acts and practices, Plaintiff and the Class have suffered (and continue to suffer) injury and harm, including economic damages.

150.    Any requirement to provide notice to the Defendants under Massachusetts General Laws Chapter 93A, Section 9(3) is excused because on information and belief the NewEdge entities do not maintain a place of business or do not keep assets within Massachusetts. In addition, Plaintiff and the Class were excused from providing notice to NFS because it would have been futile. As alleged above, NFS provides clearing and custody services to NewEdge customers and,

thus, cannot cure or otherwise remedy the unfair, misleading, and deceptive acts and practices committed by its affiliate, NewEdge.

151.    Based on the foregoing, Plaintiff and the Class are entitled to all remedies available pursuant to Massachusetts General Laws Chapter 93A, including, but not limited to, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 10, 2025                    LAW OFFICE OF ALFRED G. YATES, JR., P.C.


                                              /s/ Alfred G. Yates, Jr.
                                         Alfred G. Yates, Jr. (PA 17419)
                                         Gerald L. Rutledge (PA 62027)

                                    1575 McFarland Road, Suite 305
                                    Pittsburgh, PA  15216
                                    Telephone: 412/391-5164
                                    yateslaw@aol.com

                                    ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    STEPHEN R. ASTLEY
                                    ANDREW T. REES
                                    RENE A. GONZALEZ
                                    SCOTT I. DION
                                    ALEX KAPLAN
                                    225 NE Mizner Boulevard, Suite 720
                                    Boca Raton, FL  33432
                                    Telephone:  561/750-3000
                                    sastley@rgrdlaw.com
                                    arees@rgrdlaw.com
                                    rgonzalez@rgrdlaw.com
                                    sdion@rgrdlaw.com
                                    akaplan@rgrdlaw.com

                                    *Attorneys for Plaintiff*